UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

N⁰ 08 Civ. 11192 (RJS)
_____

GARRICK L. HOADLEY,

Plaintiff,

VERSUS

MONEYGRAM PAYMENT SYSTEMS, INC.,

Defendant.

_____

MEMORANDUM AND ORDER
July 9, 2009
_____

RICHARD J. SULLIVAN, District Judge:

Plaintiff Garrick Hoadley ("Plaintiff") brings this action against Defendant MoneyGram Payment Systems, Inc. ("MPSI" or "Defendant"), alleging breaches of MPSI's Amended Executive Severance Plan (the "Executive Severance Plan") and MPSI's Special Executive Severance Plan (the "Special Executive Severance Plan"). Before the Court is Defendant's motion to transfer venue, pursuant to 28 U.S.C. § 1404(a), to the United States District Court for the District of Minnesota. For the reasons set forth below, Defendant's motion is granted.

I. BACKGROUND

The background provided herein is taken from the Complaint, the parties' memoranda of law, and the affidavits submitted by the parties. The Court describes only the facts and allegations that are relevant to the resolution of Defendant's motion.

A. Facts

1. The Parties

Defendant MPSI is a wholly owned subsidiary of MoneyGram International, Inc. ("MoneyGram International," and collectively

with MPSI, "MoneyGram"). (Compl. ¶ 8.) MPSI is a Delaware corporation headquartered in Minnesota. (Aff. of David Parrin ("Parrin Aff.") ¶ 8.)

From May 1, 2006 through May 2, 2008, Plaintiff was employed in Minnesota as Vice President of Corporate Development and Strategy for MoneyGram. (Compl. ¶ 12; Decl. of Garrick Hoadley ("Hoadley Decl.") ¶ 4.) Plaintiff relocated following his departure from MoneyGram, and is presently a resident of New York. (Pl.'s Mem. at 12; Def.'s Mem. at 2.)

### 2. The Parties' Dispute

On March 25, 2008, MoneyGram received a substantial infusion of equity and debt capital ("the Capital Transaction") to support the long-term needs of the business and to provide necessary capital due to the company's portfolio losses. (Compl. ¶ 24.) The equity component of the Capital Transaction consisted of the sale of $760 million worth of shares in MoneyGram to affiliates of Thomas H. Lee Partners, L.P. ("THL") and affiliates of Goldman, Sachs & Co. ("Goldman Sachs"), giving THL and Goldman Sachs a seventy-nine percent interest in MoneyGram. (*Id.*) Effective May 2, 2008, Plaintiff resigned his position at Moneygram because of what he called a change in corporate strategy that eliminated "for the foreseeable future [Plaintiff's] ability to engage in the kind of transactions he had been hired to engage in." (*Id.* ¶ 34; Hoadley Decl. ¶ 4.)

Plaintiff was a participant in two severance plans maintained by MoneyGram. (Compl. ¶¶ 15-16, 26.) Specifically, on May 15, 2006, Plaintiff was designated a participant in the Executive Severance Plan, later amended, which provides for severance for covered executives if, following a change in control of the company, an executive resigns for "good reason." (*Id.* ¶¶ 15-15, Ex. B ("Executive Severance Plan") §§ 5(b), 6.) The Executive Severance Plan defines "good reason," in pertinent part, as "[t]he assignment to the Executive of any duties inconsistent in any respect with the Executive's position . . . , authority, duties, or responsibilities . . . or any other action by the Corporation . . . which results in a diminution in such position, authority, duties, or responsibilities." (Executive Severance Plan § 5(b).) In connection with the Capital Transaction described above, on March 24, 2008, MoneyGram also adopted the Special Executive Severance Plan, which also covered Plaintiff. (Compl. ¶ 26.) The Special Executive Severance Plan provides severance benefits to covered executives in connection with the Capital Transaction; in order to receive severance pursuant to this plan an executive must establish "good reason" for his resignation. (*Id.* Ex. C ("Special Executive Severance Plan") §§ 1, 4(b), 5.) Plaintiff claims that he was entitled, under both agreements, to terminate his employment with MPSI for "good reason" and collect the severance benefits described in the agreements. (*Id.* ¶¶ 49, 57.)

### B. Procedural History

Plaintiff filed his Complaint on December 23, 2008. On March 3, 2009, Defendant filed a motion to transfer venue to the United States District Court for the District of Minnesota, pursuant to 28 U.S.C. § 1404(a). Plaintiff filed his opposition on March 24, 2009, and Defendant's reply was filed on April 3, 2009.

## II. Discussion

### A. Legal Standard

Section 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). Motions for transfer lie within the broad discretion of the district court, and the court is to exercise that discretion with reference to notions of convenience and fairness on a case-by-case basis. *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 106 (2d Cir. 2006) (citing *In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 117 (2d Cir. 1992)). The burden of demonstrating that the action should be transferred to another District lies with the moving party. *Id.*

In considering a § 1404(a) motion, a court must determine first whether the case could have been brought in the proposed transferee district. *Reliance Ins. Co. v. Six Star, Inc.*, 155 F. Supp. 2d 49, 56 (S.D.N.Y. 2001). The Court must then determine whether transfer is appropriate. *D.H. Blair*, 462 F.3d at 106. Factors informing that decision (the "Transfer Factors") include:

> (1) the plaintiffs' choice of forum, (2) the convenience of witnesses, (3) the location of relevant documents and relative ease of access to sources of proof, (4) the convenience of parties, (5) the locus of operative facts, (6) the availability of process to compel the attendance of unwilling witnesses, and (7) the relative means of the parties.

*Id.* at 106-07. It should be noted that "[e]ach factor need not be accorded equal weight." *Wechsler v. Macke Int'l Trade, Inc.*, No. 99 Civ. 5725 (AGS), 1999 WL 1261251, at *3 (S.D.N.Y. Dec. 27, 1999); *see also Amersham Pharmacia Biotech, Inc. v. Perkin-Elmer Corp.*, 11 F. Supp. 2d 729, 730 (S.D.N.Y. 1998).

### B. Analysis

Here, because jurisdiction is founded on diversity of citizenship, the action may be commenced in, *inter alia*, "a judicial district where any defendant resides, if all defendants reside in the same State" or in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred . . . ." 28 U.S.C. § 1391(a). Since MPSI has its principal place of business in Minneapolis, Minnesota, and since at least a substantial part of the events giving rise to the claims herein occurred there, the action clearly could have been brought in the District of Minnesota. (*Id.*; Compl. ¶ 7.) Accordingly, the analysis proceeds to a balancing test. Applying the seven factors listed in *D.H. Blair*, the Court finds that Defendant has met its burden in establishing that the suit should be transferred.

Plaintiff's opposition to transfer relies heavily on the first Transfer Factor, the plaintiff's choice of forum. *D.H. Blair*, 462 F.3d at 106-07. While the Court is mindful of this factor's importance, *see, e.g.*, *Am. Eagle Outfitters, Inc. v. Tala Bros. Corp.*, 457 F. Supp. 2d 474, 479 (S.D.N.Y. 2006), the Court finds that it should not be assigned dispositive weight in this case. "[W]hen the operative facts have few meaningful connections to the plaintiff's chosen forum," as here, "the

importance of the plaintiff's choice . . . measurably diminishes." *Harris v. Brody*, 476 F. Supp. 2d 405, 406 (S.D.N.Y. 2007); *see also Kreinberg v. Dow Chem. Co.*, 496 F. Supp. 2d 329, 330 (S.D.N.Y. 2007). Here, as is discussed more fully in the Court's evaluation of the remaining *D.H. Blair* factors, the operative facts at issue in this action have little connection to New York. Though Plaintiff is now a resident of New York, he was employed by Defendant in Minnesota at all times relevant to the instant action. (Parrin Aff. ¶ 4.) Indeed, there is no indication that Plaintiff ever traveled to New York in connection with his work at MoneyGram, or that any of his job duties were connected to New York. (*Id.*) Further, the bulk of the witnesses identified by the parties as having potentially relevant testimony reside somewhere other than New York; only two of the fourteen potential witnesses specifically identified by the parties are located in New York, with the remainder located in Minnesota (nine) or Massachusetts (three). (Hoadley Decl. ¶¶ 13-14; *see also* Def.'s Mem. at 11-12.) In light of the tenuous connection between New York and the operative facts of this action, the importance of Plaintiff's choice of forum lessens materially in relation to the importance of the remaining factors to be considered.

Similarly, Transfer Factors 2, 3, and 4 — pertaining to potential witnesses and evidence — weigh heavily in favor of transfer. Numerous courts have held that the "[c]onvenience of both the party and non-party witnesses is probably the single-most important factor in the analysis of whether transfer should be granted." *Fuji Photo Film Co. v. Lexar Media, Inc.*, 415 F. Supp. 2d 370, 373 (S.D.N.Y. 2006) (citing *Berman v. Informix Corp.*, 30 F. Supp. 2d 653, 657 (S.D.N.Y. 1998)). Defendant expects to call seven witnesses from Minnesota, all of whom are current or former members of senior management or were Hoadley's subordinates at MoneyGram. (*See, e.g.*, Parrin Aff. ¶¶ 6-7; Def.'s Mem. a11-12.) Plaintiff concedes that at least two or three of the seven will be "key witness[es] in this case." (Pl.'s Mem. at 8, 10.) Plaintiff disputes the necessity, however, of calling the remaining four witnesses, despite the fact that two are part of MoneyGram's senior management. (*Id*. at 8-10.) In his Complaint, however, Plaintiff alleges in broad terms that he dealt with and consulted with members of MoneyGram's senior management on several occasions. Specifically, Plaintiff alleges that in 2008, he "consulted with MoneyGram senior management regarding the direction of the company," and that "following consultation with senior management," he "decided to resign his position." (Compl. ¶¶ 33-34.) Accordingly, the testimony of senior management as to the substance of these conversations is clearly relevant to a determination of whether Plaintiff had good reason to resign. Furthermore, Plaintiff himself identifies two additional witnesses, both located in Minnesota, whom he anticipates Defendant will call with respect to the question of whether Plaintiff possessed "good reason" to resign. (Hoadley Decl. ¶ 13; Pl.'s Mem. at 9-10.) As a result, there is no dispute that there are at least four to five — and as many as nine — witnesses located within Minnesota that may be called in this matter.

Witnesses and evidence weighing against transfer are sparse. Aside from Plaintiff himself, who resides in New York, any links

to this District come from five potential witnesses located in New York or closer to New York than to Minnesota. Specifically, Plaintiff points to two Goldman Sachs employees involved in the Capital Transaction, both located in New York (Pl.'s Mem. at 10), and three THL employees involved in the Capital Transaction, all of whom are located in Boston (*Id.*). It is unclear whether these employees were directly and integrally involved in the Capital Transaction, or how material their testimony would be to the central issue of whether Plaintiff had "good reason" to leave MPSI. Accordingly, it seems clear that Transfer Factors 2, 3, and 4 weigh strongly in favor of Defendant on this motion.[1]

The fifth Transfer Factor is the locus of operative facts. *D.H. Blair*, 462 F.3d at 107. As noted above, few, if any, operative facts relate to New York. Instead, the operative facts — including where Plaintiff was employed, the determination of Plaintiff's job duties, the supervision of Plaintiff's work, and discussions Plaintiff had with Defendant's senior management leading up to his decision to resign — all took place in Minnesota. (Parrin Aff. ¶ 4; Compl. ¶¶ 33-34.) Further, though Plaintiff contends that senior management instructed him to "obtain permission from THL and Goldman Sachs to engage in certain business transactions on behalf of MPSI," there is no allegation that Plaintiff ever had any communication with THL or Goldman Sachs regarding any diminishment of his job duties, or that the witnesses Plaintiff identifies from these two entities are the persons from whom Plaintiff might have sought such permission or discussed his duties. (*See* Hoadley Decl. ¶ 11.) Thus, like the prior factors, the locus of operative facts weighs strongly in favor of transfer. *See, e.g.*, *Wechsler*, 1999 WL 1261251, at *4 (where "there is no material connection between this district and the operative facts . . . the interests of justice require the transfer of the action") (citing *Brown v. Dow Corning Corp.*, No. 93 Civ. 5510 (AGS), 1996 WL 257614, at *2 (S.D.N.Y. May 15, 1996)); *see also Von Pein v. Hedstrom Corp.*, No. 03 Civ. 2171 (RCC), 2004 WL 60298, at *2 (S.D.N.Y. Jan. 13, 2004) (transferring a case from the Southern District of New York to the Northern District of Illinois where the case arose "out of an employment relationship in the Northern District of Illinois").

With respect to the sixth Transfer Factor, the availability of process to compel the attendance of unwilling witnesses, *D.H. Blair*, 462 F.3d at 107, it should be noted that one of Defendant's potential witnesses is MoneyGram's former CEO, who still resides in Minnesota. Should his testimony become relevant, as a non-party, he would be outside of this Court's subpoena power. *See* Fed. R. Civ. P. 45; *Von Pein*, 2004 WL 60298, at *2. He could, however, be compelled to testify in the District of Minnesota. Other witnesses who reside in neither New York nor Minnesota — such as the THL witnesses in Boston — pose identical problems with respect to the availability of process to compel testimony. Accordingly, this Transfer Factor weighs only slightly in favor of Defendant.

---

[1] With respect to the location of documents, Defendant contends, and Plaintiff does not dispute, that many of the documents are in fact located in the District of Minnesota. The portability of documents and papers, however, make this a relatively neutral factor. *See Am. Eagle Outfitters, Inc.*, 457 F. Supp. 2d at 478.

*D.H. Blair*'s seventh factor is the relative means of the parties. *D.H. Blair*, 462 F.3d at 107. While it is fair to assume that Defendant's resources exceed those of an individual plaintiff, there is little in the record before the Court to suggest that transfer of this action to Minnesota will pose a financial hardship to Plaintiff. Moreover, in light of all seven factors, the Court finds that, on balance, Plaintiff's choice of forum and the presumed disparity in relative means is not significant enough to overcome the strength of the other five factors.

Accordingly, based on the plain interests of justice and judicial economy set forth above, the Court finds that Defendant has met its burden of establishing that this action should be transferred to the District of Minnesota pursuant to 28 U.S.C. § 1404(a)

### III. CONCLUSION

For the foregoing reasons, the Court grants Defendant's motion to transfer venue pursuant to 28 U.S.C. § 1404(a). The Clerk of the Court is respectfully directed to transfer this matter to the United States District Court for the District of Minnesota, and to terminate this case.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

Dated: July 9, 2009
New York, New York

\*\*\*

Plaintiff is represented by Edward P. Grosz, Reitler, Brown, & Rosenblatt, L.L.C., 800 Third Avenue, New York, NY 10022. Defendant is represented by Jeffrey L. Loop, Dorsey & Whitney, L.L.C., 250 Park Avenue, New York, NY 10177.